273 F.3d 262 (2nd Cir. 2001)
 JUDI BOISSON, PLAINTIFF-APPELLANT,
AMERICAN COUNTRY QUILTS AND LINENS, INC., D/B/A/ JUDI BOISSON AMERICAN COUNTRY, PLAINTIFF-COUNTER-DEFENDANT-APPELLANT,
v.
BANIAN, LTD., & VIJAY RAO, DEFENDANTS-COUNTER-CLAIMANTS-APPELLEES,
JOHN DOES I-V, DEFENDANTS.
 Docket No. 00-7300
August Term, 2000
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 Argued November 15, 2000
Decided December 3, 2001
 
 Plaintiff Judi Boisson and plaintiff/counter-defendant American Country Quilts and Linens, Inc., d/b/a Judi Boisson American Country, appeal from a judgment entered February 28, 2000 in the United States District Court for the Eastern District of New York (Platt, J.), which dismissed plaintiffs' claims of copyright infringement following a bench trial.
 
 
 1
 Affirmed in part; reversed in part; and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 Paul R. Levenson, New York, New York (Kaplan Gottbetter & Levenson, Llp, New York, New York, of counsel), for Plaintiff Judi Boisson and American Country Quilts and Linens, Inc.
 
 
 3
 G. Roxanne Elings, New York, New York (Sudipta Rao, Greenberg Traurig, Llp, New York, New York, of counsel), for Defendants Banian, Ltd. and Vijay Rao.
 
 
 4
 Before: Cardamone, Calabresi, Circuit Judges, and HAIGHT*, District Judge.
 
 
 5
 Cardamone, Circuit Judge.
 
 
 6
 Plaintiffs Judi Boisson and her wholly-owned company, American Country Quilts and Linens, Inc., d/b/a Judi Boisson American Country, brought suit in the United States District Court for the Eastern District of New York (Platt, J.), alleging that defendants Vijay Rao and his wholly-owned company Banian Ltd., illegally copied two quilt designs for which plaintiffs had obtained copyright registrations. Following a bench trial, the trial court, in denying the claims of copyright infringement, ruled that defendants' quilts were not substantially similar to what it deemed were the protectible elements of plaintiffs' works. Plaintiffs have appealed this ruling. Copying the creative works of others is an old story, one often accomplished by the copyist changing or disfiguring the copied work to pass it off as his own. Stealing the particular expression of another's ideas is rightly condemned in the law because pirating the expression of the author's creative ideas risks diminishing the author's exclusive rights to her work, or as a poet said, taking all that she may be or all that she has been.
 
 
 7
 In reviewing this decision, we find plaintiffs' copyrights cover more elements than were recognized by the trial court, and that though the trial court articulated the proper test when comparing the contested works, its application of that test was too narrow. It failed not only to account for the protectible elements we identify, but also to consider the overall look and feel brought about by the creator's arrangement of unprotectible elements. Hence, we disagree with part of the district court's ruling and find some instances of copyright infringement. The trial court's disposition of those claims must therefore be reversed and remanded for a determination as to what remedies should be awarded.
 
 BACKGROUND
 
 8
 Judi Boisson has been in the quilt trade for over 20 years, beginning her career by selling antique American quilts -- in particular, Amish quilts -- she purchased in various states throughout the country. By the late 1980s, having difficulty finding antique quilts, she decided to design and manufacture her own and began selling them in 1991 through her company. Boisson published catalogs in 1993 and 1996 to advertise and sell her quilts. Her works are also sold to linen, gift, antique, and children's stores and high-end catalog companies. Various home furnishing magazines have published articles featuring Boisson and her quilts.
 
 
 9
 In 1991 plaintiff designed and produced two alphabet quilts entitled "School Days I" and "School Days II." Although we later describe the quilts in greater detail, we note each consists of square blocks containing the capital letters of the alphabet, displayed in order. The blocks are set in horizontal rows and vertical columns, with the last row filled by blocks containing various pictures or icons. The letters and blocks are made up of different colors, set off by a white border and colored edging.
 
 
 10
 Boisson testified at trial that she worked on these quilts at home where she drew the letters by hand, decided on their placement in the quilts, picked out the color combinations and chose the quilting patterns. She obtained certificates of copyright registration for each quilt on December 9, 1991. All of her quilts, as well as the catalogs advertising them, include a copyright notice.
 
 
 11
 Defendant Vijay Rao is the president and sole shareholder of defendant Banian Ltd., incorporated in November 1991. Rao is an electrical engineer in the telecommunications industry who became interested in selling quilts in February 1992. To that end, he imported from India each of the three alphabet quilts at issue in this case. He sold them through boutique stores and catalog companies. The first quilt he ordered was "ABC Green Version I," which he had been shown by a third party. Defendants have not sold this pattern since 1993. "ABC Green Version II" was ordered in September 1994, based upon modifications to "ABC Green Version I" requested by Rao. Defendants reordered this quilt once in April 1995, and then stopped selling it in March 1997. Regarding "ABC Navy," Rao testified that he designed the quilt himself based upon "ABC Green Version II" and imported finished copies in November 1995. Defendants voluntarily withdrew their "ABC Navy" quilts from the market in November 1998 following the initiation of this litigation.
 
 
 12
 Plaintiffs filed their suit in March 1997 seeking relief from defendants for copyright infringement, false designation of origin and unfair competition. Plaintiffs also alleged causes of action pertaining to a quilt involving a star design, but the parties agreed to dismiss those claims. Defendants counterclaimed against American Country Quilts and Linens for interference with commercial relations.
 
 
 13
 The district court held a three-day bench trial in October 1999 at which documentary evidence was received and a number of witnesses testified. The witnesses were Boisson; her daughter, who related having seen and photographed one of defendants' alphabet quilts at a trade show; plaintiffs' expert witness, who testified regarding the similarities between plaintiffs' and defendants' quilts; defendant Rao; and defendants' expert witness, who testified as to the history of alphabet quilts. At the conclusion of the trial, the district court dismissed all of plaintiffs' claims, dismissed defendants' counterclaim and denied defendants' motion for attorney's fees in a memorandum and order dated February 14, 2000. Plaintiffs have appealed from the judgment entered February 28, 2000, challenging only that part of the order and judgment that dismissed their copyright infringement claims.
 
 DISCUSSION
 
 14
 Copyright infringement is established by proving "ownership of a valid copyright" and "copying of constituent elements of the work that are original." Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Throughout the following analysis the key consideration is the extent to which plaintiffs' work is original. See id. at 361-64, 111 S. Ct. 1282.
 
 I. Ownership of a Valid Copyright
 
 15
 The Copyright Act provides that a "certificate of [copyright] registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c) (1994). Boisson secured certificates of registration for both "School Days" quilts in 1991, the same year in which she designed them, so that we must presume she holds valid copyrights. Although such a presumption may be rebutted, Folio Impressions, Inc. v. Byer Cal., 937 F.2d 759, 763 (2d Cir. 1991), the district court found there was insufficient proof to support defendants' argument that plaintiffs deliberately misled the Copyright Office when submitting their applications. By not challenging that finding on appeal, defendants concede the validity of plaintiffs' copyrights.
 
 II. Actual Copying of Plaintiffs' Work
 
 16
 The element of copying breaks down into two parts. Plaintiffs must first show that defendants "actually copied" their quilts. Streetwise Maps, Inc. v. Vandam, Inc., 159 F.3d 739, 747 (2d Cir. 1998). Actual copying may be established by direct or indirect evidence. Laureyssens v. Idea Group, Inc., 964 F.2d 131, 140 (2d Cir. 1992). Indirect evidence may include proof of "access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." Id. The district court made a finding that actual copying had occurred, and because defendants do not dispute that finding, actual copying is also established. But not all copying results in copyright infringement, even if the plaintiff has a valid copyright. Feist Publ'ns, 499 U.S. at 361. Plaintiffs must also demonstrate "substantial similarity" between defendants' quilts and the protectible elements of their own quilts. Streetwise Maps, 159 F.3d at 747; accord Laureyssens, 964 F.2d at 140.
 
 III. Originality
 
 17
 Plaintiffs' certificates of registration constitute prima facie evidence of the validity not only of their copyrights, but also of the originality of their works. Gaste v. Kaiserman, 863 F.2d 1061, 1066 (2d Cir. 1988) ("We also note that on the issue of originality, as compared to the issue of compliance with statutory formalities, it is even clearer that copyright registration created a presumption of validity."). Yet copyright protection extends only to a particular expression of an idea, and not to the idea itself. Folio Impressions, 937 F.2d at 765; accord Beaudin v. Ben & Jerry's Homemade, Inc., 95 F.3d 1, 2 (2d Cir. 1996); Reyher v. Children's Television Workshop, 533 F.2d 87, 91 (2d Cir. 1976). Simply because a work is copyrighted does not mean every element of that work is protected.
 
 
 18
 "The threshold question is what characteristics of [plaintiffs'] design have gained copyright protection." Herbert Rosenthal Jewelry Corp. v. Honora Jewelry Co., 509 F.2d 64, 65 (2d Cir. 1974) (per curiam); see also Folio Impressions, 937 F.2d at 762-65 (determining at the outset which elements of a fabric design were copyrightable). Inasmuch as protection extends only to those components of a work that are original to the author, originality is "the sine qua non of copyright." Feist Publ'ns, 499 U.S. at 348. We now review Boisson's works to determine the extent to which they are original.
 
 
 19
 Copyright law does not define the term "originality." Rather, courts have derived its meaning from art. I, § 8, cl. 8 of the United States Constitution, which authorizes Congress "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." See Feist Publ'ns, 499 U.S. at 346. Originality does not mean that the work for which copyright protection is sought must be either novel or unique, Trade-Mark Cases, 100 U.S. 82, 94 (1879), it simply means a work independently created by its author, one not copied from pre-existing works, and a work that comes from the exercise of the creative powers of the author's mind, in other words, "the fruits of [the author's] intellectual labor." Id. The Supreme Court gave an example when it said, in upholding the validity of a copyright to a photo of Oscar Wilde, the photographer made a "'useful, new, harmonious, characteristic, and graceful picture... entirely from his own mental conception, to which he gave visible form by posing the [subject] and arranging the costume, draperies, and other various accessories... so as to present graceful outlines.'" Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 60 (1884).
 
 
 20
 If a work is not original, then it is unprotectible. Likewise an element within a work may be unprotectible even if other elements, or the work as a whole, warrant protection. Some material is unprotectible because it is in the public domain, which means that it "is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work." Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 710 (2d Cir. 1992).
 
 Ruling of the Trial Court
 
 21
 Following the bench trial, the district court found some elements of plaintiffs' quilts were unprotectible (i.e., not original) because they were in the public domain: (1) the alphabet, (2) formation of the alphabet using six rows of five blocks across and four icons in the last row, and (3) color. Although that court expressed doubt as to whether copyright protection would extend to the shapes of the letters used in the quilts, it did not rule on that issue. These determinations as to originality may be overturned only if clearly erroneous. See Matthew Bender & Co. v. West Publ'g Co., 158 F.3d 674, 681 (2d Cir. 1998). A finding is clearly erroneous if, upon reviewing the entire record, we are left with "the definite and firm conviction" that a mistake was made. Anderson v. City of Bessemer, 470 U.S. 564, 573 (1985).
 
 1. Use of Alphabet
 
 22
 Passing now to the court's ruling, it correctly determined that the alphabet is in the public domain, a finding plaintiffs do not dispute. Nor could they object, considering the applicable regulations provide no copyright protection for "familiar symbols or designs" or "mere variations of... lettering." 37 C.F.R. § 202.1(a) (2000).
 
 2. Layouts of Alphabet
 
 23
 To support its finding that the layouts of plaintiffs' quilts were not protected by copyright, the district court relied upon evidence submitted by defendants showing that alphabet quilts have been in existence for over a century, suggesting that such layouts were also in the public domain. One circa 1900 quilt displayed letters and icons in blocks arranged in the same format used in "School Days I." From this evidence the court reasoned that such formation belonged to the public domain. Although it made specific findings only as to the block formation in "School Days I," we presume for purposes of our discussion that, in the absence of a specific finding as to the "School Days II" format, the trial court intended its findings on unprotectibility to extend to the layouts of both of plaintiffs' quilts.
 
 
 24
 These findings are clearly erroneous. Not only did plaintiffs obtain valid certificates of copyright registration, but also the alphabetical arrangement of the letters in the five-by-six block format required some minimum degree of creativity, which is all that is required for copyrightability. Moreover, unlike the use of letters, no federal regulation establishes that the use of this layout is unprotectible. These factors create a presumption that the layout is original and therefore a protectible element. Therefore, if defendants want to contest this presumption, they bear the burden of proving that this particular layout is not original. Cf. Gaste, 863 F.2d at 1064 (explaining that burden of proof is on defendant in infringement action who claims the plaintiff's copyright registration is invalid). At trial, defendants asserted that the particular layout of plaintiffs' quilts was copied from the public domain, but they presented insufficient proof to establish that proposition.
 
 
 25
 As noted earlier, a plaintiff attempting to prove actual copying on the part of a defendant is entitled to use direct or indirect evidence. Indirect evidence of access and substantial similarity to the plaintiff's work can "support an inference" that copying took place. Streetwise Maps, 159 F.3d at 747. Scholars disagree as to whether a defendant may also rely upon circumstantial evidence to show that a plaintiff copied from the public domain.
 
 
 26
 Compare Jessica Litman, The Public Domain, 39 Emory L.J. 965, 1002-03 (1990) (explaining that a defendant is not entitled to any inference that a plaintiff copied from the public domain simply by showing access and substantial similarity to the public domain work), with Russ VerSteeg, Rethinking Originality, 34 Wm. & Mary L. Rev. 801, 874-75 & n.328 (1993) (permitting a defendant to show copying on the part of the plaintiff through circumstantial evidence that the plaintiff had access and created a work substantially similar to a public domain work). Assuming arguendo that an inference is allowable, defendants in the case at hand nevertheless fall short of proving Boisson copied from the public domain.
 
 
 27
 Access may be established directly or inferred from the fact that a work was widely disseminated or that a party had a reasonable possibility of viewing the prior work. See generally 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright, § 13.02[A] (2001) (describing the ways in which access can be shown). Defendants proffered no evidence that Boisson owned an alphabet quilt prior to designing "School Days I" or "School Days II." Instead they point to Boisson's affirmative answer when asked at her deposition whether she had "seen an alphabet design in any other quilts." Boisson was not asked what these quilts looked like or when she saw them relative to designing her own quilts, or whether they bore any resemblance to her own designs.
 
 
 28
 Moreover, having seen an alphabet design would not conclusively establish that Boisson saw one from which she copied the arrangement of letters for her "School Days" quilts. As defendants' own proof reveals, alphabet quilts are not limited to the formations found in either the 1900 quilt or plaintiffs' quilts. Some quilts display letters out of order; some display three letters in the first and last rows with five letters in each of the middle rows; one has six letters in rows with icons placed in the border; another has varying numbers of letters in each row with icons or quilting designs in the remaining blocks; while still others have five rows of five letters with the "Z" by itself in a corner or followed by numbers representing the year the quilt was made. Nor are all letters of the alphabet always displayed or even displayed with each letter in its own block.
 
 
 29
 Defendants also failed to show that quilts with layouts similar to the "School Days" quilts were so widely disseminated or known as to infer that Boisson reasonably would have seen one before designing her own works. In particular, bearing in mind that Boisson testified as to her specialty in Amish quilts, among the books submitted by defendants into evidence for purposes of showing copying on the part of plaintiffs, only two pertained specifically to Amish designs -- Rachel & Kenneth Pellman, The World of Amish Quilts (1998) and Rachel & Kenneth Pellman, A Treasury of Amish Quilts (1998). Neither book, however, contains an alphabet quilt, although they do contain photographs of other quilts owned by Boisson. Further, Boisson testified at her deposition that she was unaware of any Amish alphabet quilts and had never seen one.
 
 
 30
 Absent evidence of copying, an author is entitled to copyright protection for an independently produced original work despite its identical nature to a prior work, because it is independent creation, and not novelty that is required. See 1 Nimmer & Nimmer, supra, § 2.01[A], at 2-9; see also Feist Publ'ns, 499 U.S. at 345 (explaining that a work is "original" for the purposes of copyright law so long as it was "independently created"). Judge Jerome Frank said that an "'author' is entitled to a copyright if he independently contrived a work completely identical with what went before." Alfred Bell & Co. v. Catalda Fine Arts, Inc., 191 F.2d 99, 103 (2d Cir. 1951).
 
 3. Shapes of Letters
 
 31
 The trial judge made no explicit finding with respect to the shapes of the letters of the alphabet. Instead, the court stated it was "questionable" whether plaintiffs could copyright the shapes of the letters used, and it cited the regulation that provides "mere variations of typographic ornamentation" are not copyrightable. 37 C.F.R. § 202.1(a). At this juncture, we hesitate to say that letter shapes are unprotectible in this context, but in the absence of a trial court finding, it is not necessary for us to reach this issue.
 
 4. Color
 
 32
 Color by itself is not subject to copyright protection. See 37 C.F.R. § 202.1(a). Nevertheless, "[a]n original combination or arrangement of colors should be regarded as an artistic creation capable of copyright protection." 1 Nimmer & Nimmer, supra, § 2.14, at 2-178.4. We have previously declined to single out color as an individual element when conducting a copyright infringement analysis. In Streetwise Maps, 159 F.3d at 748, we determined that "instead of examining the [plaintiff's and defendants'] maps feature-by-feature, viewing the individual colors chosen by [plaintiff] as the protected elements upon which defendants encroached, we focus on the overall manner in which [plaintiff] selected, coordinated, and arranged the expressive elements in its map, including color, to depict the map's factual content" (emphasis added). We reached this conclusion after considering the following two Circuit precedents.
 
 
 33
 Knitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2d Cir. 1995), involved the copyrightability of children's sweater designs. In finding copyright violations, we considered the plaintiff's original contributions to include: "(1) selecting leaves and squirrels as its dominant design elements; (2) coordinating these design elements with a 'fall' palette of colors and with a'shadow-striped'... or a four-paneled... background; and (3) arranging all the design elements and colors into an original pattern for each sweater." Id. at 1004. Similarly, in Novelty Textile Mills, Inc. v. Joan Fabrics Corp., 558 F.2d 1090, 1093 n.5 (2d Cir. 1977), we viewed color in conjunction with the plaid fabric designs utilized by the parties.
 
 
 34
 Taken together, these cases teach that even though a particular color is not copyrightable, the author's choice in incorporating color with other elements may be copyrighted. This lesson is in accord with the holding of Feist Publications. See 499 U.S. at 348 ("[C]hoices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws."). Boisson testified that she selected on a trial-and-error basis what colors to use, without reference to any existing work. This approach, combined with Boisson's other creative choices, leads us to conclude it was clear error for the district court to find that plaintiffs' choice of colors in the "School Days" quilts was an unprotectible element.
 
 
 35
 IV. Substantial Similarity: Ordinary Observer v. More Discerning Observer
 
 
 36
 Having found that plaintiffs' quilts are entitled to copyright protection and that defendants actually copied at least some elements of plaintiffs' quilts, we turn our analysis to defendants' contention that its quilts were not substantially similar to plaintiffs'. We review de novo the district court's determination with respect to substantial similarity because credibility is not at stake and all that is required is a visual comparison of the products -- a task we may perform as well as the district court. Folio Impressions, 937 F.2d at 766; accord Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 70 (2d Cir. 1999).
 
 
 37
 Generally, an allegedly infringing work is considered substantially similar to a copyrighted work if "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." Folio Impressions, 937 F.2d at 765. Yet in Folio Impressions, the evidence at trial showed the plaintiff designer had copied the background for its fabric from a public domain document and "contributed nothing, not even a trivial variation." 937 F.2d at 764. Thus, part of the plaintiff's fabric was not original and therefore not protectible. We articulated the need for an ordinary observer to be "more discerning" in such circumstances.
 
 
 38
 [T]he ordinary observer would compare the finished product that the fabric designs were intended to grace (women's dresses), and would be inclined to view the entire dress -- consisting of protectible and unprotectible elements -- as one whole. Here, since only some of the design enjoys copyright protection, the observer's inspection must be more discerning.
 
 
 39
 Id. at 765-66. Shortly after Folio Impressions was decided, we reiterated that a "more refined analysis" is required where a plaintiff's work is not "wholly original," but rather incorporates elements from the public domain. Key Publ'ns, Inc. v. Chinatown Today Publ'g Enters., Inc., 945 F.2d 509, 514 (2d Cir. 1991). In these instances, "[w]hat must be shown is substantial similarity between those elements, and only those elements, that provide copyrightability to the allegedly infringed compilation." Id. In contrast, where the plaintiff's work contains no material imported from the public domain, the "more discerning" test is unnecessary. Hamil Am., Inc. v. GFI, 193 F.3d 92, 101-02 (2d Cir. 1999), cert. denied, 528 U.S. 1160 (2000). In the case at hand, because the alphabet was taken from the public domain, we must apply the "more discerning" ordinary observer test.
 
 
 40
 In applying this test, a court is not to dissect the works at issue into separate components and compare only the copyrightable elements. Knitwaves, 71 F.3d at 1003. To do so would be to take the "more discerning" test to an extreme, which would result in almost nothing being copyrightable because original works broken down into their composite parts would usually be little more than basic unprotectible elements like letters, colors and symbols. Id. This outcome --affording no copyright protection to an original compilation of unprotectible elements -- would be contrary to the Supreme Court's holding in Feist Publications.
 
 
 41
 Although the "more discerning" test has not always been identified by name in our case law, we have nevertheless always recognized that the test is guided by comparing the "total concept and feel" of the contested works. Knitwaves, 71 F.3d at 1003. For example, in Streetwise Maps, 159 F.3d at 748, we found no infringement -- not because the plaintiff's map consisted of public domain facts such as street locations, landmasses, bodies of water and landmarks, as well as color -- but rather "because the total concept and overall feel created by the two works may not be said to be substantially similar." In Nihon Keizai Shimbun, 166 F.3d at 70-71, we conducted a side-by-side comparison of the articles and abstracts at issue to determine whether a copyright infringement had occurred. Looking beyond the unprotected facts, we analyzed how alike or different the abstracts were in their structure and organization of the facts. Id. at 71.
 
 
 42
 Likewise, when evaluating claims of infringement involving literary works, we have noted that while liability would result only if the protectible elements were substantially similar, our examination would encompass "the similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting of the [plaintiff's] books and the [defendants'] works." Williams, 84 F.3d at 588; see also id. at 590 ("[A] scattershot approach cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another."). But see Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp., 25 F.3d 119, 123-24 (2d Cir. 1994) (pre-dating Knitwaves and comparing feature-by-feature only the protectible elements of copyrighted dolls).
 
 
 43
 In the present case, while use of the alphabet may not provide a basis for infringement, we must compare defendants' quilts and plaintiffs' quilts on the basis of the arrangement and shapes of the letters, the colors chosen to represent the letters and other parts of the quilts, the quilting patterns, the particular icons chosen and their placement. Our analysis of the "total concept and feel" of these works should be instructed by common sense. Cf. Hamil Am., 193 F.3d at 102 (noting that the ordinary observer test involves an examination of "total concept and feel," which in turn can be guided by "good eyes and common sense"). It is at this juncture that we part from the district court, which never considered the arrangement of the whole when comparing plaintiffs' works with defendants'. With this concept in mind, we pass to a comparison of the quilts at issue.
 
 V. Comparison
 A. "School Days I" v. "ABC Green" Versions
 
 44
 "School Days I" consists of six horizontal rows, each row containing five blocks, with a capital letter or an icon in each block. The groupings of blocks in each row are as follows: A-E; F-J; K-O; P-T; U-Y; and Z with four icons following in the last row. The four icons are a cat, a house, a single-starred American flag and a basket. "ABC Green Version I" displays the capital letters of the alphabet in the same formation. The four icons in the last row are a cow jumping over the moon, a sailboat, a bear and a star. "ABC Green Version II" is identical to "ABC Green Version I," except that the picture of the cow jumping over the moon is somewhat altered, the bear is replaced by a teddy bear sitting up and wearing a vest that looks like a single-starred American flag, and the star in the last block is represented in a different color.
 
 
 45
 All three quilts use a combination of contrasting solid color fabrics or a combination of solid and polka-dotted fabrics to represent the blocks and letters. The following similarities are observed in plaintiffs' and defendants' designs: "A" is dark blue on a light blue background; "B" is red on a white background; "D" is made of polka-dot fabric on a light blue background; "F" on plaintiffs' "School Days I" is white on a pink background, while the "F" on defendants' "ABC Green" versions is pink on a white background; "G" has a green background; "H" and "L" are each a shade of blue on a white background; "M" in each quilt is a shade of yellow on a white background. "N" is green on a white background; "O" is blue on a polka-dot background; "P" is polka-dot fabric on a yellow background; "Q" is brown on a light background; "R" is pink on a gray/purple background. "S" is white on a red background; "T" is blue on a white background; "U" is gray on a white background; "V" is white on a gray background; "W" is pink on a white background; "X" is purple in all quilts, albeit in different shades, on a light background; "Y" is a shade of yellow on the same light background; and "Z" is navy blue or black, in all the quilts.
 
 
 46
 Boisson also testified that defendants utilized the same unique shapes as she had given to the letters "J," "M," "N," "P," "R" and "W." With respect to the quilting patterns, "School Days I" and the "ABC Green" versions feature diamond-shaped quilting within the blocks and a "wavy" pattern in the plain white border that surrounds the blocks. The quilts are also edged with a 3/8" green binding.
 
 
 47
 From this enormous amount of sameness, we think defendants' quilts sufficiently similar to plaintiffs' design as to demonstrate illegal copying. In particular, the overwhelming similarities in color choices lean toward a finding of infringement. See 1 Nimmer & Nimmer, supra, § 2.14, at 2-178.4 ("[S]imilarity of color arrangements may create an inference of copying of other protectible subject matter."), quoted in Primcot Fabrics, Dep't of Prismatic Fabrics, Inc. v. Kleinfab Corp., 368 F. Supp. 482, 485 (S.D.N.Y. 1974). Although the icons chosen for each quilt are different and defendants added a green rectangular border around their rows of blocks, these differences are not sufficient to cause even the "more discerning" observer to think the quilts are other than substantially similar insofar as the protectible elements of plaintiffs' quilt are concerned. See Williams, 84 F.3d at 588 ("[D]issimilarity between some aspects of the works will not automatically relieve the infringer of liability." (emphasis removed)); Sheldon v. Metro-Goldwyn Pictures Corp., 81 F.2d 49, 56 (2d Cir. 1936) ("[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate."). Moreover, the substitution in "ABC Green Version II" of the teddy bear wearing a flag vest as the third icon causes this version of defendants' quilt to look even more like plaintiffs' quilt that uses a single-starred American flag as its third icon. Consequently, both of defendants' "ABC Green" quilts infringed plaintiffs' copyright on its "School Days I" quilt.
 
 
 48
 B. "School Days I" v. "ABC Navy"
 
 
 49
 We agree with the district court, however, that Rao did not infringe on plaintiffs' design in "School Days I" when he created "ABC Navy." While both quilts utilize an arrangement of six horizontal rows of five blocks each, "ABC Navy" does not have its four icons in the last row. Rather, the teddy bear with the flag vest is placed after the "A" in the first row, the cow jumping over the moon is placed after the "L" in the third row, the star is placed after the "S" in the fifth row, and the sailboat is placed after the "Z" in the last row. Further, the colors chosen to represent the letters and the blocks in "ABC Navy" are, for the most part, entirely different from "School Days I." Defendants dropped the use of polka-dot fabric, and plaintiffs did not even offer a color comparison in their proposed findings of fact to the district court, as they had with each of the "ABC Green" versions. The quilting pattern in the plain white border is changed to a "zig-zag" in "ABC Navy," as opposed to plaintiffs' "wavy" design. Finally, although defendants use a binding around the edge of their quilt, in this instance it is blue instead of green.
 
 
 50
 Looking at these quilts side-by-side, we conclude they are not substantially similar to one another. Just as we rejected defendants' earlier argument and held that what few differences existed between "School Days I" and the "ABC Green" quilts could not preclude a finding of infringement, plaintiffs' emphasis on the similarity in style between some of the letters between "School Days I" and "ABC Navy" cannot support a finding of infringement. See Williams, 84 F.3d at 588 ("[W]hen the similarities between the protected elements of plaintiff's work and the allegedly infringing work are of'small import quantitatively or qualitatively[,]' the defendant will be found innocent of infringement."). Because no observer, let alone a "more discerning" observer, would likely find the two works to be substantially similar, no copyright violation could properly be found.
 
 C. "School Days II" v. "ABC Green" Versions
 
 51
 Boisson modified her design in "School Days II" in that she utilized seven horizontal rows of four blocks each. The capital letters are displayed A-D, E-H, I-L, M-P, Q-T, U-X, and Y-Z followed by two blocks showing a single-starred American flag and a house. In addition, she framed the rows of blocks with a red rectangular border and vertical blue stripes located off to the left and right sides. The remainder of the quilt is white, with a blue binding on the edge.
 
 
 52
 The quilting patterns and the colors used to display the letters and the blocks are substantially the same as those used in "School Days I," as are the shapes of the letters. These similarities between "School Days II" and "School Days I" mean the same similarities are shared with both of defendants' "ABC Green" quilts. Nevertheless, the "total concept and feel" of the quilts are not substantially similar. As in Streetwise Maps, where the maps at issue each depicted geographical facts pertaining to New York City but were found to do so in ways that were not alike, defendants' "ABC Green" quilts depict the alphabet in a manner different from "School Days II." Beyond the difference in how the letters are arranged, this version of plaintiffs' quilt uses the colors red, white and blue to depict a look and feel of American patriotism, while defendants' predominant use of green in their borders and edging do not create the same impression.
 
 
 53
 D. "School Days II" v. "ABC Navy"
 
 
 54
 As has been explained, although "School Days II" shares the same color combinations in its display of letters and blocks as in "School Days I," defendants' "ABC Navy" quilt does not share the same color combinations as "School Days I." Defendants' quilt is therefore different from "School Days II" in this regard as well. Combined with the varying number of rows and blocks, the placement of icons, the different use and color of rectangular borders around the blocks and the choice of quilting patterns, we agree with the district court that defendants have committed no copyright infringement in their design of "ABC Navy" when compared to plaintiffs' "School Days II." The similarity in letter design and the use of a blue edge are so trivial in the overall look of the two quilts that defendants did not infringe on plaintiffs' copyright.
 
 VI Remedies
 
 55
 The district court, having dismissed all of plaintiffs' claims for infringement, never reached the question of what remedies should be awarded. Plaintiffs seek the maximum statutory damages under 17 U.S.C. § 504, as well as attorney's fees, costs and the issuance of a permanent injunction. Because these matters are better first decided in the trial court, we remand plaintiffs' successful claims to that court for consideration of appropriate remedies. See Scribner v. Summers, 84 F.3d 554, 559 (2d Cir. 1996) (remanding for damages calculations after determining liability on the part of defendants, because "[t]his task is better left to the district court in the first instance").
 
 CONCLUSION
 
 56
 For the reasons stated above, we affirm the judgment of the district court insofar as it found no infringement on the part of defendants with respect to their "ABC Navy" quilt as compared to plaintiffs' "School Days I" and "School Days II" quilts and their "ABC Green Version I" and "ABC Green Version II" quilts as compared to plaintiffs' "School Days II" quilt. We reverse the judgment of the district court with respect to plaintiffs' remaining claims, and find defendants' versions I and II of their "ABC Green" quilts infringed on plaintiffs' "School Days I" quilt. Accordingly, we remand the case to the district court for it to determine the appropriate remedies.
 
 
 
 NOTE:
 
 
 *
 Hon. Charles S. Haight, Jr., Senior United States District Court Judge for the Southern District of New York, sitting by designation.